Your Honours, may it please the Court, Michael Kimberley for Plaintiff Appellant Clifford George. I'd like to reserve five minutes. Your Honours, this case involves what courts universally have recognized to be one of the most invasive and degrading kinds of searches possible. A warrantless rectal cavity search undertaken under forced general anesthesia. We are unaware of any case by any court to condone the kind of search that took place here. Defendants have pointed to none, and that's not surprising because courts universally condemn searches like this, even in circumstances where officers have the benefit of probable cause in a judicially approved search warrant, which of course was lacking in this case. Nevertheless, granting summary judgment to the defendants, the District Court made two core errors. First, it held that no rational jury could find that the officers in Dr. Edholm were engaged in a Section 1983 civil conspiracy to violate Mr. George's Fourth and Fourteenth Amendment rights. And second, it found that no rational jury could find that there were medically acceptable, less invasive alternatives to extracting the evidence from Mr. George's rectal cavity. Both of those holdings on the record presently before the Court are wrong. As to the civil conspiracy issue, the standard at this point is fairly low at the summary judgment standard. We need to point to evidence in the record from which a jury could conclude that the officers in Edholm were acting cooperatively together towards a common goal. The evidence, the kind of evidence that would satisfy this standard is evidence that, for instance, the officers encouraged Edholm or vice versa, and that, in general, the officers in Edholm were working together. There's evidence of both of those things. What do we do with the district judge's conclusion that, irrespective of what Freeman might have instructed Dr. Edholm to do, Dr. Edholm said, listen, I was going to do what I was going to do. It doesn't matter what they told me to do. And, therefore, says Judge Wu, he was acting independently. And there's no, at least, direct evidence to contradict that. Well, so for I think the counterfactual, what would have happened absent the conspiracy, is a question with no bearing on whether a conspiracy existed in the first place. My question is a little different from that. Edholm says, I would have done this anyway. Right. It doesn't matter what Freeman might or might not have told me. Right. How do we know that that's not true? Well, we don't know that that's not true, although we don't know that it's not true, but it's not relevant, I think, to finding that the officers here can be held liable under Section 1983. But how's their causation, then, if Edholm would have done this, irrespective of what Freeman told him to do? Well, so I think it's important to separate out two different things. There's a question of causation. There's a question of the conspiracy. For purposes of the conspiracy, what Edholm would have done absent intervention from the officers is beside the point. We can imagine, for instance, a conspiracy to commit some crime, and after the crime is committed, one of the members of the conspiracy says, well, I would have done it all by myself, even if my co-conspirators hadn't participated with me. That doesn't vitiate the existence of the conspiracy. And so that doesn't undermine the imputability of all of the co-conspirators' conduct to one another. And so I mean, I understand that for a criminal conspiracy. I'm not sure I can import all that criminal conspiracy law here, where what you have is no charging of any crime, of course, by Dr. Edholm or by either of the two defendants. What's charged in the civil suit is that they're cooperating, and that, therefore, what Dr. Edholm did is state action. That's right. Yes. And so I think that's a question apart from sort of a separate causation question. The existence of a conspiracy, if the evidence is sufficient to support one, and we submit that it is, is enough entirely apart from what Edholm would have done absent the conspiracy, is enough to impute what he did do to the State and the officers. And so the – and this is what the Supreme Court held in West v. Adkins. It said it's no answer to the imputability of a professional's conduct to the State to say that the professional was acting in accordance with professional standards and so would have done what he or she did independent of any influence from the State. The point is when a doctor in a situation like this – when officers come to a hospital to recruit a doctor to help them to achieve a goal, what the doctor does becomes a part of sort of the officer's endeavor to achieve what it is they're trying to achieve. Here, for instance, recovering drug evidence from a suspect's rectum. So it may be, in the end, that Dr. Edholm's conduct was – he would have done it independently. And, in fact, the evidence is he says he does this sort of search in every case, regardless whether there's any basis for thinking there's a medical emergency. So we have reason to believe, in fact, that he would have done the same thing, regardless of the officer's intervention. But that isn't to say – And perhaps in inference that that's the reason the officers took – Well, that's exactly right. To Dr. Edholm. That's exactly right. So you can imagine perhaps a physician in a hospital like this develops a reputation for always going in with the most invasive and efficient and effective way of retrieving drug evidence from suspects' body cavities. In a situation like that, officers may then seek out that officer – excuse me, seek out that doctor anytime they suspect that a detainee has drugs hidden in a body cavity, knowing that that doctor would perform the quickest and most effective method for recovering the drugs. Well, you put it that he said this was the appropriate thing to do, whether or not it was a medical emergency. I think the import of his testimony is that every one of these kinds of cases is a medical emergency. Well, that's true, but there is evidence to think otherwise. And certainly there are the holdings of every other court to consider a case like this. Well, is that what we should be looking at, or should we be looking at it from the point of view of the physician who is administering the treatment? If everybody else in the world thinks that this is not a medical emergency, but he genuinely does, shouldn't we be looking at it from his perspective? Well, so I think there's a question of qualified immunity as to Dr. Edholm himself. That question may have bearing on. But certainly the question – if Dr. Edholm, in fact, was sort of caught up in this conspiracy and thus became a state actor by virtue of his cooperation with the officers, he is no less subject to Fourth Amendment constraints than anyone else. And if the objective fact is that less intrusive alternatives, less degrading alternatives are available and medically appropriate under the circumstances, and there is evidence in this case that such alternatives were available, he, no less than anyone, is required by the Fourth Amendment to adhere to the – to those less intrusive alternatives. Well, in this case – so there's medical records that show that, in fact, George's heart rate was 120 and his blood pressure was 180 over 50, which is extraordinarily high. Edholm used that as one of the bases for saying that he was in immediate danger of death and justifying this. Right. What do you – what counter-evidence do you have to that? Well, so we have two responses. First, there is evidence in the officer's testimony that under similar circumstances alternatives were used. For instance, Officer Johnson testified that he had been involved in a case where, in fact, the drug packet had ruptured. And in that case, the suspect was taken to the ICU for monitoring, in Officer Johnson's own words, for monitoring, where the hospital staff administered a laxative suppository and the drugs were recovered later in a bowel movement. There's no indication in this case that a similar procedure could not have been used. So we have that, and we also have Officer Freeman's testimony that he was aware of cases like this in the past where detainees had been placed on porta potties. And we have Edholm's deposition testimony where there's a case in which there was a rupture and the patient died. Well, Edholm speaks only in generalities. No, I don't think this was a generality. He's referring to a specific case. It's not this case, but as I recollect his deposition testimony, he says there was a case where it ruptured and the patient died. It was unclear to me on the reading of that record whether that was a patient of his or if it was a story that he had heard. In any event, what we can say about Dr. Edholm's testimony is that he repeatedly said he remembered nothing of this particular encounter. He said repeatedly, this is at ER 77, ER 80, ER 86, he says over and over again, I don't remember this case. And he was testifying only based on the records that were before him. Now, apart from that, he says that his preferred method for extracting evidence in circumstances like this, in every such case, is the tactic that he used here. And I will say, apart from that also, the reason that he, in reviewing the materials before him, said he thought that this was an emergency situation, which he says at ER 92, is because the officers informed him that Edholm had had a seizure at the jail. Now, a rational jury certainly could find that Edholm's supposed seizure was in fact faked, that the officers believed that it was faked, and that they took Edholm, excuse me, that they took George to the hospital for the purpose of recruiting a doctor to recover the drug evidence and not solely, at least not solely, for medical clearance. And then subsequently informed hospital staff and Dr. Edholm that he had a seizure on, and understanding that this then would incite the hospital staff to extract the evidence as quickly as possible. Did you want to save some time? I would, yes. I'll reserve the balance of my time. Thank you. Good afternoon, Your Honors. Sharon Medine on behalf of Detective Freeman and Corporal Johnson. I would like to begin by just briefly responding to a couple of the statements made by counsel just a moment ago. Can I clarify? You're not representing Edholm? No. Was he ever served in this case? It's my understanding that he was served. He never filed an answer. No default was ever taken. That's all. That's all I know. Okay. I would submit that the argument that, or Dr. Edholm's testimony, that he treated Mr. George in the same manner that he would treat any other patient coming into the emergency room with similar situation, similar vital signs, suspected of packing cocaine in the rectum, would militate toward a finding of no conspiracy, in the sense that he's treating everyone equally, not that he treated Mr. George differently simply because he was brought in by the police in custody, suspected of cocaine. Why didn't the officers get a warrant? It's my understanding that the reason they didn't get a warrant was because this wasn't, they weren't transporting him to the hospital for the retrieval of evidence as they're characterizing it. They were required by jail policy to get a medical clearance prior to booking. But didn't the paramedics come and take his vital signs and say he was fine? They thought he was fine and they left? My understanding is that there was, at least in the record under Mr. George's transcript, that the paramedics found that he was having, that he had a mild seizure, but that he was okay at that point. But it still required, the policy still required the officers to take him to an emergency facility for medical clearance prior to continuing with the booking process. Which policy required that? I can change. 2-100.51b requires, well, indicates that all prisoners entering the jail are the responsibility of the transporting officer. 2-100.51d sets forth the medical condition, medical conditions that may, that require medical clearance prior to booking. One of them is seizures, epilepsy, that sort of thing. 3-200.51 is the provision that requires the pre-booking care and medical clearance form before proceeding. And there's nothing in the policies that say that there's an exception if any of the officers don't agree with the policy or with whether or not the person is truly exhibiting signs of a medical condition or not. So in conjunction, all of those policies together would dictate that the officers obtain the medical clearance prior to booking. Now, in terms of what the purpose that the officers had in mind, I think it's possible that both there's a policy to take people in who had an apparent seizure, even if the officers suspect, as I think they did suspect that this one was faked. But at the same time, they also took him there because they wanted that evidence and they wanted it right now, and they were kind of mad at him because he'd concealed it right there in front of them. And according to Mr. George, Freeman's rather aggressive in the room with Dr. Edholm saying, I know it's in there. You've got to take it out. So what do we do with that? Well, I understand that testimony, but I think the focus is really on the – there's a portion of the opening brief where they state a portion – they take a portion of Corporal Johnson's deposition transcript out of context where they talk about how removal was required and that sort of thing. And those answers were given in response to general questions regarding medical conditions under which a suspect would be transported to the ER. And those responses were not given specifically in regard to this particular circumstance. And in those responses, Corporal Johnson makes clear that this is a medical issue. This is a concern that they have for the safety of the people that they have arrested. He – I'm not sure that's directly responsive to what I was asking. It seems to me that you're correct, that there does appear to be a policy that if there's an apparent seizure, they're supposed to take somebody to the hospital. I got that. Okay. But we have testimony that's quite direct, repeated, and consistent from Mr. George that Freeman very directly – and I think I can summarize or encapsulate it properly – aggressively tells Edholm, I know it's there, you've got to take it out, and we need it right now. That suggests to me that Freeman may have some other purpose than merely following the policy. He wants that out, and he wants it out right now. I understand that, and I think that necessarily goes back to the questions that were raised a few minutes ago by the panel, and that is, what did Dr. Edholm do? Dr. Edholm specifically testified, I don't care what he was telling me, I did this based on my independent medical examination of Mr. George, my interpretation of his vital signs, the tests that were administered by the hospital staff, yes, in conjunction with the history that was given to him by the officers that he was suspected of cocaine packing. Yes, that's true, but all of those things played into Dr. Edholm's independent decision to undertake this method of treatment. So the fact that Detective Freeman may have had an independent sort of desire to have the cocaine packet removed for evidentiary purposes is beside the point. It's what did Dr. Edholm do, and why did he do it? It's clear from his testimony that he did not do it because the officers asked him to. He specifically says, I did not do this at the direction of the police officers. I wonder if you could comment on the interplay between Mr. George's right to consent or to deny consent to the procedure and Dr. Edholm's position that this was a medical emergency. Does Mr. George have the right to say there's no evidence in the record that he's incompetent, and it's obvious, I think it's undisputed in the record, that he's resisting, he's not consenting to the procedure. Can he stop the search because he doesn't want the procedure done, whether it is to save his life or not? On that question, I believe that the case of the Seventh Circuit case that we have cited in our answering brief, Sullivan, is the most instructive. In that case, the court of appeal talks about a reduced expectation of privacy after the individual is arrested. The idea that brief restraint at the direction of hospital staff is not a violation of someone's Fourth Amendment rights. Well, it's a little more than that. Right. No. And I realize that, that the court goes on to say that talks about the reduced expectation of privacy, that to essentially to put the officers in the position of having to second guess whether a particular sort of medical treatment is necessary and to intervene and say, well, no, he's not consenting, that sort of thing, puts the But doesn't he, I think what Judge Sullivan is asking, he was subjected to general anesthesia, right? Yes. Doesn't everybody have a right not to consent to that given to the high risk involved and many risks involved in the administration of general anesthesia? Well, it's clear that the, from this case as well, that the substantive rights, due process right to refuse medical treatment is not absolute. Whether the due process rights have been violated has to be determined based on balancing the interests, State interests that are at play. And in this case, it's, the court specifically finds that State has a substantial interest in assuring medical, the medical stability of its pretrial detainees. So there's sort of a This is someone who's just been arrested, right? He hasn't even been arraigned or indicted or anything, right? He's just been arrested. Correct. Okay. And so you're saying that the government has the right to take an arrestee to the hospital and subject him to general anesthesia in order to obtain evidence? Well, see, there's the distinction. We don't see this as a situation where the purpose is to obtain evidence. We believe that this falls directly within the exception to the Fourth Amendment warrant requirement for situations where there is a medical emergency. Well, if that's a, if that's, is an issue, if that's relevant and determinative and is, the evidence is subject to varying inferences, was summary judgment appropriate in this case? Yes. And I think one of the most critical reasons that summary judgment was appropriate in this case was, is because of the conspiracy issue. I think that the undisputed facts establish that this was a decision that was made by Dr. Edholm, not a decision that was made by the officers. Absent the conspiracy, the constitutional question just doesn't arise. The officers, what troubles me is that the officers took George to the doctor and told him that he had something in him, and the doctor sees these vital signs that are high, possibly consistent with other things such as stress, but has the knowledge that he's, has cocaine in him, and then asks, but where does he get that knowledge? Yes. Officers routinely will provide their observations and that sort of thing to emergency room staff when they bring in custodies into the emergency room for medical clearance. Right. But they were supposedly bringing him in because he'd had a seizure, so. And it's my understanding that they were, that the hospital staff was also told about the seizure as well. And so it would make it very difficult for officers who are responsible for the well-being of their detainees to have a department policy that requires them to seek medical attention for an individual under certain circumstances, and yet when they get to the hospital, if they provide background information, now they're opening themselves up to a conspiracy claim, a Fourth Amendment claim, if something that's done by hospital staff down the road is objectionable to them. And that's a very difficult and precarious situation in replacing law enforcement. I want to make sure I understand your position. So your position is that once someone is arrested, if there's a medical emergency, I'll assume this is a medical emergency and the doctor at home thought it was. Yes. That the patient, the arrestee, is no longer in a position to be able to refuse medical treatment, even though if he had not been under arrest, he could have refused. That seems to be the suggestion of the Sullivan case, yes. That's my reading of the case. And like I said, I was not able to find a Ninth Circuit case or a Supreme Court case that was as directly as on point as I believe this case is. Do you think the trial court below addressed the 14th Amendment claim relating to refusing to consent to medical treatment? I'm sorry, did the trial court address this 14th Amendment claim? Not in much detail. It was briefed, but I don't believe there was much. I don't believe it was actually addressed in the written opinion, but it was briefed. Thank you. And I would like just to add one other point with respect to Corporal Johnson. It's our position that the undisputed facts demonstrate that at the very least, summary judgment should be affirmed with respect to him. The testimony provided by Mr. George during his deposition indicates that there were at least two other officers present in the emergency room with him that day. Another officer, Johnson, who he refers to as the black guy during his deposition, and another officer who drove him back to the jail after the whole ordeal at the emergency room was completed. When he was asked at his deposition who was holding your legs, the only officer, he couldn't say how many officers were holding his legs, the only officer he could identify was Officer Freeman. He obviously knew who Officer Johnson was and did not identify him as one of the officers holding his legs. In addition, when the aggressive management portion of what Dr. Edholm describes as the aggressive management, the actual retrieval with the forceps of the cocaine packet, his testimony is unambiguously clear that the officers at that point were seated on the other side of the room or standing. He's not sure if they were seated or standing at the chairs on the opposite side of the room. So there is nothing, no testimony from Mr. George that Corporal Johnson did anything to impair his Fourth or Fourteenth Amendment rights. The only individual that he has specific knowledge or allegations concerning is Detective Freeman. Counsel, you're over your time. Thank you. Okay. Thank you. Your Honors, I have three points to make. First, if this Court holds that there is no constitutional violation any time a doctor says that he or she undertakes a particular invasive procedure, every time he or she is present, he or she is presented with a police detainee where the police inform the doctor that they suspect cocaine packing. If in every such case where the doctor says I undertake this invasive procedure, it's the case that there is no causation and that the constitutional violation is vitiated, such a holding will invite every doctor to adopt such a procedure, in essence to insulate him or herself against the possibility of liability in cases like this one. That would be inconsistent with the holdings of every other court decision that we cited in our opening brief, all of which held that doctors, just like anyone else in situations like this, are subject to Fourth Amendment restrictions when they act in concert with police officers. Now, it may be the case that here what Dr. Edholm did was medically reasonable. But the question here isn't just whether it was medically reasonable. It's whether there were medically reasonable alternatives that were less invasive. That's the question that the Fourth Amendment, that the 1983 conspiracy issue imposes on Dr. Edholm by virtue of the Fourth Amendment. Acting as a State actor, he had an obligation to act objectively reasonable, not only within the meaning of the medical professional, medical professional standards, but also the Fourth Amendment objective reasonableness standard. So let me make sure I understand where that argument's going. That is, if it turns out that Dr. Edholm's consistent practice was whenever he was confronted with a patient who had a plastic baggie inserted in his rectum that had cocaine in it, he would do this kind of procedure rather than do some sort of enema or some laxative or something else to have it just pass naturally. Even if that is his normal and uniform procedure in such cases, your argument is, well, that might actually be an unreasonable thing to do. And if he's doing it because police have brought him in, and the police may have as a motivation that they want the evidence and they don't really want to bother to get a warrant, that that then is a constitutional violation, even though he does it all the time. That's absolutely right. That is absolutely correct. And it bears mention here also that Dr. Edholm expressly disclaimed that he's an expert in this area. He said he'd done it a number of times, but when asked whether he held himself out as an expert in the retrieval of drug evidence from body cavities, he said he was not. And so it may, in a circumstance like this ---- It kind of depends. I mean, he said, I do it a lot. I think the question really was, are you an expert witness? And he said no. Well, regardless, the point is if there are medically reasonable, less intrusive alternatives available, and a jury could find that such alternatives were available in this case based on the testimony from Officer Johnson concerning a case in which a drug packet had in fact ruptured and the suspect was taken up to the ICU and monitored and administered a laxative and the drugs were recovered that way, given that alternative, our argument is in fact that Edholm was required by the Constitution to undertake that procedure. Now, it may be absent of conspiracy. Let's say someone just walks in and says, I've got drugs in my rectum. I can't get it out. Help me. It may be in that case where there is no constitutional overlay, because he's acting as a private person, that he wouldn't be subject to that same limitation. But the point is, acting in concert with the officers, he becomes a state actor, his conduct then becomes imputable to the state, and as a state actor, he becomes subject to the restrictions of the Fourth Amendment. So is it possible, and I'm trying to figure out how this might work in another circumstance where we're not talking state action and we're not talking Fourteenth Amendment, but rather someone comes into the hospital on his own, he's got a plastic baggie with crack cocaine up his rectum, and he says to the doctor, I would much prefer to have this pass naturally. I do not give you consent to do an invasive procedure such as Mr. George was subjected to. Is it a valid defense for Dr. Edholm to say I did it because I wanted to save his life? Is that enough? Or does Dr. Edholm have to prove that it was necessary to save his life rather than just what he thought in his judgment was necessary? So that's an interesting question. I think it's one that the Court need an answer in this case. I understand it's not the situation, but I'm trying to figure out At what point a consistent practice of a doctor is a defense to various objections where your consistent practice really was not medically required? When there was an objection by the patient. Right. I mean, I think in a circumstance like you've described, that might be right. And in a case like that where there's no constitutional overlay, there may be a State law claim for battery or something of this sort, or even just medical malpractice for undertaking a procedure contrary to the physician's patient's consent. I think that very well could be the case. Just one other very quick clarification. I don't think the question here is whether there was a medical emergency. The question is a bit more subtle than that. It's simply whether there was a medically appropriate alternative for dealing with the situation as Dr. Edholm perceived it. And as I say, based on the testimony in this case, Well, I'm not sure that's right because Dr. Edholm in his deposition specifically says I did it because I viewed it as a medical emergency. That's the only time I do it. And I do it because it's, in my judgment, the risk of rupture and then risk of death is so substantial. Now, he may or may not be right that the risk of death always justifies this, but he says it was an emergency. Let's be clear, though. His testimony, one, and I reiterate, he remembers nothing of this case. He was speaking in generalities. And his testimony was that I believe in every such case there is a possibility of a rupture and there is a possibility of an imminent risk of life-threatening intoxication. Now, what other courts have held is in a circumstance like that, it's not enough to use an invasive technique like this unless there is, in fact, objective evidence that the drugs have ruptured and there is, as a matter of fact, an imminent threat to that person's life, where it otherwise, Dr. Edholm's theory, would license him to undertake this sort of invasive technique in literally every drug-packing case, because, as he says, every case involves a possibility like that. All right. Thank you, Your Honor. Thank you, counsel. The case of George v. Edholm will be submitted, and this Court is in recess for the day. All rise. This Court is at recess, Your Honor.
judges: Lynn, Wardlaw, Fletcher